UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In Re:

MIRABILIS VENTURES, INC.,

    Debtor.
_____/

CASE NO.: 6:08-bk-04327-KSJ

CHAPTER 11

MIRABILIS VENTURES, INC.,

    Plaintiff,

v.

JAMES MOORE & CO., P. L., a
Florida limited liability corporation,
and E. JAMES HUTTO, an individual,

    Defendants.
_____/

ADV. PRO. NO.:

## COMPLAINT

Plaintiff, Mirabilis Ventures, Inc., ("MVI") hereby sues Defendants, JAMES MOORE & CO., P. L., ("Moore & Co."), a Florida limited liability corporation; and E. JAMES HUTTO, ("HUTTO"), an individual, and alleges as follows:

### NATURE OF THE ACTION

This is an action for compensatory damages against the Defendants stemming from their involvement and representation of MVI and its subsidiaries including but not limited to AEM.

1

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157 because it arises in and is related to a case under Title 11 of the United States Code.

2. Defendants are subject to the personal jurisdiction of this Court because many of the tortious acts alleged herein occurred in or were directed to the state of Florida. Upon information and belief, moreover, Defendant Moore & Co. maintains an office and is engaged in systematic and continuous business activity within the state of Florida. Defendants are also subject to personal jurisdiction pursuant to 18 U.S.C. §1965(d).

3. Venue is proper in this district pursuant to 28 U.S.C. §1409, 28 U.S.C. 1391(b), and 18 U.S.C. §1965(c).

4. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(O).

## THE PARTIES AND OTHER RELEVANT ENTITIES

5. Plaintiff, MVI, is a Nevada corporation with its principal place of business located at 341 N. Maitland Ave., Suite 201 in Maitland, Florida.

6. Moore & Co. is a Florida limited liability corporation with its principal place of business in Alachua County, Florida.

7. Upon information and belief, Hutto is a citizen and resident of Alachua County, Florida, and sui juris, who was at all times relevant to the events described herein a Partner, employee and agent of Hutto and was acting within the scope of his partnership, employment and that agency.

8. This Court has subject matter jurisdiction of this action pursuant to Florida Statutes §26.012(2)(a).

9. The events giving rise to the claims alleged in this Complaint arose in Orange County, Florida. Venue in this Court is therefore proper pursuant to Florida Statutes Ch. 47.

10. All conditions precedent to the bringing of this action has occurred, or their performance has been waived by Defendants.

## GENERAL ALLEGATIONS

11. At all times material hereto, Hutto was a Florida certified public accountant ("PA") and was actively engaged in the practice of public accounting.

12. In or about August 2004, Frank Amodeo (Amodeo") was approached by principals of Presidion Corporation, a publicly-traded company, and its affiliates and subsidiaries (collectively "Presidion"), regarding developing and implementing a plan of reorganization for Presidion.

13. At the time, Presidion owed over $55,000,000.00 in outstanding liabilities, with the majority of said liabilities being payroll taxes owed by certain professional employee organization operating subsidiaries of Presidion, including Sunshine Staff Leasing, Inc. a/k/a Presidion Solutions, I, Inc. ("Sunshine Staffing"); Sunshine Companies, II, Inc. ("Sunshine II"); Sunshine Companies, III, Inc. a/k/a Presidion Solutions, IV, Inc. ("Sunshine III"); and Sunshine Companies, IV, Inc. a/k/a Presidion Solutions, V, Inc. ("Sunshine IV") (collectively the "Sunshine Companies").

14. Amodeo's proposed strategy involved deconsolidating, divesting, and liquidating the Sunshine Companies.

15. The divestiture and liquidation of the Sunshine Companies would then be used to pay creditors, including the Internal Revenue Service.

16. Additionally, Amodeo's proposed strategy allowed Presidion to deconsolidate its financials and separate itself from the excessive liabilities associated with its subsidiaries, allowing it to continue to conduct business as a going concern (collectively the "Sunshine Companies Plan").

17. Because of the complexities involved in the Sunshine Companies Plan, particularly with regard to legal and tax implications of the proposed strategy, Amodeo sought advice and opinions from multiple professionals including Defendants, other attorneys, and accountants qualified to provide such advice.

18. Defendants attended numerous meetings and worked extensively in providing advice and counsel relevant to the Sunshine Companies Plan.

19. In particular, on December 21, 2004, Amodeo, Berman, Holtz and Marrero, principals of Rachlin, the General Counsel of Presidion, and various other professionals met to develop a detailed assignment of tasks with respect to the Sunshine Companies Plan.

20. Marrero was represented to Amodeo as having more than 20 years of experience in the Internal Revenue Service, where he served in many roles, including deputy director of the Criminal Investigation Division. In that role, it was represented that Marrero directed the national policies and programs of Criminal Investigation employees in the Office of Strategy. As the special agent in charge of the Miami field office, he was responsible for all criminal investigation resources in the southern district of Florida, Puerto Rico and the U.S. Virgin Islands.

21.     On January 6, 2005, Berman, Marrero, Daniel Myers, and Hans C. Beyer met with Amodeo at the Plantation, Florida Internal Revenue Service collections office (the "Plantation Office") in which the details of the Sunshine Companies Plan were specifically discussed, including the non-payment of taxes by the Sunshine Companies, of which the Internal Revenue Service was unaware.

22.     At this meeting, the Internal Revenue Service requested that Amodeo relocate the principal business office of all tax-distressed entities he was a consultant of, including the Sunshine Companies, to a post office box in Hollywood, Florida. This would ensure that all such entities' cases were assigned to the Plantation Office.

23.     Rachlin and Marrero also requested that their principal address be placed in the Plantation Office system so that Rachlin was copied on all Internal Revenue Service communication to the Sunshine Companies and other tax-distressed entities Amodeo was involved with as a result of the overall Presidion engagement.

24.     Contemporaneous with this plan, a company called Stellar Industries, Inc., was purchased, and subsequently renamed Mirabilis Ventures, Inc. ("MVI"). At that time MVI was to act as a vehicle by which to hold an option to purchase 25% of the issued and outstanding common stock of Presidion for $100,000 (the "Presidion Stock Option").

25.     MVI and AEM were created to help reorganize and preserve the Professional Employer Organization ("PEO") assets of Presidion Solutions, Inc. ("PSI"), a subsidiary of Presidion Corporation (sometimes collectively referred to herein as "Presidion"). Mirabilis and AEM were tasked with this job by Frank Amodeo and

AQMI, a consulting organization hired by Presidion to resolve Presidion's outstanding problems, including mounting payroll tax liabilities.

26.     Amodeo and AQMI developed a plan for Presidion, which was primarily designed to preserve, restore, and maximize the inherent value of the Presidion PEO assets, which had become depressed because of a myriad of problems created by mismanagement of Presidion and its subsidiaries, including the acquisition of large payroll tax liability. The plan involved creating successor companies, MVI and AEM, to acquire the Presidion PEO assets, including two subsidiaries of PSI known as Professional Benefits Solutions, Inc. ("PBS") and Paradyme, Inc. ("Paradyme"), resell them, and use the proceeds to pay unsecured priority state and federal tax creditors.

27.     On January 8, 2005, Mirabilis purchased all shares of common stock issued to Burcham, the then chairman of Presidion (the "Burcham Shares").

28.     Amodeo and AQMI successfully completed the Sunshine Companies Plan in or about April 2005.

29.     In April 2005, MVI chose to distribute to the AQMI consultants the Burcham Shares, as opposed to acquiring stock pursuant to the Presidion Stock Option and distributing those shares to the AQMI consultants engaged relevant to the Sunshine Companies Plan. Based upon the advice provided by various professionals retained by MVI, including Defendants, Rachlin, Holtz and Marrero, it was determined that distributing the Burcham Shares, as opposed to exercising the Presidion Stock Option, would allow MVI to operate as a creditor of Presidion, instead of as a major shareholder.

30.     MVI was initially capitalized by Titanium and AQMI, companies owned solely by Amodeo. MVI would be further capitalized through: (i) MVI's provision of

6

risk arbitrage services; and (ii) interim nonpayment of payroll taxes owed by PSI's PEO operating subsidiaries.

31. In preparation for an eventual acquisition of the remaining Presidion PEO assets, in June 2005 MVI decided to acquire a PEO shell company called AEM.

32. Based on tax and legal advice provided by professionals including Defendants, Amodeo proposed a strategy whereby Presidion would be provided working capital through:

    i. PSI, accurately accounting and reporting the taxes collected by PBS and/or Paradyme, relevant to their respective federal employer identification numbers ("FEIN"); and

    ii. Using the collected payroll tax funds to: (1) pay for services to be rendered by PSI to Paradyme in the ordinary course of business; (2) pay all of unsecured creditors of Presidion; and (3) refinance the secured creditors of Presidion (collectively the "PBS Plan").

33. The PBS Plan would allow for accrued tax liabilities to remain with the FEIN of PBS and/or Paradyme, while providing additional funds to enable the PEO operations to continue until the business could pay all of its outstanding liabilities.

34. Furthermore, as part of the PBS Plan, on July 28, 2005 Wellington subsequently purchased PSI, and in effect the remaining Presidion PEO assets, so as to preserve the value of the assets, and to maintain Presidion's PEO operations as a viable business in the interim, so that the business would be financially rehabilitated for purposes of a sale to AEM, MVI's subsidiary, at a later date.

35. Additionally, AEM and PSI entered into an agreement and subsequent amendment whereby AEM would purchase the PEO assets from PSI in December 2005.

36. In or about August 2005, prior to AEM's planned acquisition of the Presidion PEO assets, AEM entered into a management agreement with PSI wherein it would oversee the processing of the Presidion PEO assets while performing its due diligence (the "Management Agreement").

37. Pursuant to the Management Agreement, AEM warranted and represented to PSI that WEM would comply with all applicable federal, state, and local laws, rules, and regulations, codes, statutes, ordinances and orders of any governmental or regulatory authority relevant to PBS, Paradyme, and/or the Presidion PEO assets.

38. During the initial term of the Management Agreement, AEM and Wellington determined that the Presidion PEO assets had a significant amount of previously undisclosed problems and that the Management Agreement would need to be extended until January 2006 to allow AEM an appropriate amount of time to resolve the various problems related to the Presidion PEO assets, which included the inability of AEM to effectively transfer the data and licenses of the Presidion IT system. AEM was required to retain an interest in the Presidion PEO assets because, absent AEM's involvement, Presidion or its management was unable to obtain worker's compensation insurance coverage for its own customer accounts.

39. In January 2006, AEM discovered that the Presidion PEO assets would not be ready for acquisition until approximately April 2006 as a result of the aforementioned inability of AEM to transfer Presidion's customer data into AEM's IT system.

40. As a result thereof, during the period beginning January 2006 and ending on or about April 2006, AEM agreed to allow PSI to use AEM's bank accounts to process the payroll of the Presidion PEO assets.

41. While all payroll tax collections and reporting continued to take place through PBS and/or Paradyme and under the PBS FEIN, the payroll tax payments began to be made under the AEM FEIN, *not the PBS FEIN*. Beginning in March 2006, all tax payments owed by PBS and/or Paradyme, via collection of taxes on the Presidion PEO assets, had ceased.

42. On or about April 1, 2006, AEM officially acquired the Presidion PEO assets; however, MVI and AEM management subsequently decided to rescind the acquisition of the Presidion PEO assets and to continue under the Management Agreement to allow them additional time to re-evaluate the Presidion PEO assets and terminate unprofitable clients.

43. During the Sunshine Companies Plan, Amodeo sought and received legal and tax advice from various professionals, particularly Defendants, which provided, in pertinent part, that any tax liabilities incurred by a subsidiary would remain with that subsidiary and such liability would not attach to the detriment of the parent company or affiliated subsidiaries such as MVI and AEM pursuant to a strict silo theory of tax liability.

44. Defendants were actively engaged in, and a part of, MVI's audits for years ended December 31, 2004 and December 31, 2005 and issued an audit report for MVI dated July 17, 2006.

45. At all times material hereto, Defendants were actively involved in providing advice relevant to, and directly participating in, the development and implementation of the 2004, 2005 and July 17, 20067 audit report.

   a. The audit opinion has an "except for" clause for certain entities which were defined as Variable Interest Entities (VIE's) and the effects they could have on the financial statements.

   b. Defendants assisted in answering questions asked to MVI, its subsidiaries and related companies, PSI, the Sunshine Companies, PBS, and Paradyme by the District Counsel for the Plantation Office;

   c. Defendants also determined that Amodeo entities and MVI were under common control;

   d. Defendants audited the $30 million line of credit from Titanium Technologies, a company owned by Amodeo.

46. Extensive research and written opinions were provided by the professionals retained by Amodeo, including Defendants, to validate the financials of MVI.

47. As opposed to advising MVI of the any criminal liability potentially resulting from the Sunshine Companies Plan, PBS Plan and all of MVI's operations, and resigning/terminating their representation if MVI, its subsidiaries and related companies did not cease what could be potentially illegal conduct, Defendants chose to instead obtain a direct pecuniary interest from their representation of MVI, its subsidiaries and related companies.

48. Particularly, Defendants were the beneficiaries of direct compensation and consideration flowing from the Sunshine Companies Plan and PBS Plan and the resulting unpaid payroll "trust fund" taxes of PSI, PBS, and Paradyme, including:

    a. Defendants' employment with MVI, its subsidiaries and related companies resulted in direct compensation;

    b. Defendants receiving compensation for professional fees for services rendered to MVI and its related entities during 2005 through 2006.

49. In or about September 2006, the Internal Revenue Service and United States Attorney's Office for the Middle District of Florida began investigating Amodeo, Presidion, PSI, and others for potential civil and criminal liability arising from the alleged evasion of payment of taxes in connection with the Sunshine Companies Plan and PBS Plan.

50. Pursuant to the doctrine of respondeat superior, Moore & Co. is vicariously liable to MVI and its related entities for the actions of its Partners, employees and agents, including Hutto.

## COUNT I – NEGLIGENCE

51. MVI hereby reasserts by reference in this Count I the allegations of Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52. By accepting employment to render financial, tax and regulatory advice to MVI, Defendants had a duty to render such services carefully, accurately, faithfully, skillfully, with reasonable expediency, and with a standard of care that accords with the standards of CPAs who are qualified by training and experience to perform similar services in the community, as the services they represented and contracted to render to

MVI required a knowledge of tax accounting, and auditing methods that were represented as superior to that of MVI.

53. Defendants breached their aforementioned duties and deviated from the applicable standards of professional care in that they failed to advise MVI that the Sunshine Companies Plan and PBS could result in criminal liability for individuals acting in connection therewith, including MVI; Defendants failed to inform MVI that concerns were raised by various other professionals about the legality of the Sunshine Companies Plan and PBS Plan

54. As a direct and proximate result of Defendants' negligence, MVI has suffered damage to his business, property, as well as emotional and mental injury, and accordingly seeks compensatory damages in an amount in excess of $200,000,000.00.

## COUNT II – BREACH OF FIDUCIARY DUTY AND SELF-DEALING

54. MVI hereby reasserts by reference in this Count II the allegations of Paragrpahs 1 through 50 of this Complaint as if fully set forth herein.

55. At all times material hereto, a fiduciary relationship existed between MVI, its subsidiaries and related companies and Defendants, particularly, Defendants had a fiduciary duty to honor the trust and confidence of MVI with respect to their engagement to render services on his behalf.

56. Defendants each breached their fiduciary duties to MVI, its subsidiaries and related companies, by virtue of their conduct described hereinabove, particularly, Defendants each failed to advise MVI that persons with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes and that failure to

intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from MVI as to the potential consequences of the Sunshine Companies Plan and PBS Plan; Defendants failed to inform MVI that concerns were raised by various other professionals about the legality of the Sunshine Companies Plan and PBS Plan.

57. Additionally, Defendants' breach of their fiduciary duties allowed Hutto to confer a benefit upon himself in a private capacity.

58. As a direct and proximate result of Defendants' breach of fiduciary duties and self-dealing, MVI, its subsidiaries and related companies have been damaged in their business and property and accordingly seeks compensatory damages in excess of $200,000,000.00.

WHEREFORE, the Plaintiff, MVI, demands the following relief:

59. That MVI have and recover from the Defendants compensatory damages resulting from Defendants' negligence, breach of fiduciary duties, and for such other and further relief to which MVI may be entitled.

### COUNT III
### NEGLIGENT MISREPRESENTATION

60. Cuthill incorporates paragraphs 1 through 50 of the Complaint as if fully set forth herein.

61. This Count is a cause of action against Defendants for negligent misrepresentation.

62. Defendants knew, or should have known, that MVI, its subsidiaries and related companies were relying on the information supplied and representations and

statements made by Defendants in connection with their representation of MVI's entities in deciding how to run and operate its businesses.

63.     Defendants owed MVI, its subsidiaries and related companies a duty of reasonable care, skill and diligence to ensure that all of the information supplied and representations and statements made to or on behalf of MVI and its related entities were true and accurate. This duty required Defendants to reasonably investigate the facts pertinent to the representation and provide MVI and its related entities with true and accurate information in connection with their representation.

64.     Defendants breached their duty by making the material negligent misrepresentations and omissions described above when in the exercise of reasonable care should have known, facts or circumstances indicating that these negligent misrepresentations and omissions were materially misleading at the time they were made.

65.     As a direct and proximate result of the negligent misrepresentations made by Defendants, MVI, its subsidiaries and related companies have suffered damages of over $200,000,000.00, exclusive of interest, attorneys' fees and costs.

WHEREFORE, Cuthill demands judgment against Defendants: (1) awarding compensatory damages for all harm suffered as a result of their negligent misrepresentations; (2) awarding prejudgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## COUNT IV
## PROFESSIONAL NEGLIGENCE

66.     Cuthill incorporates paragraphs 1 through 50 of the Complaint as if fully set forth herein.

67. This Count is a cause of action against Defendants for professional negligence.

68. As a result of their representation of MVI, its subsidiaries and related companies Defendants knew or should have known, that MVI, its entities were relying on their work product, representations, and statements in deciding how to operate and conduct its businesses.

69. Defendants owed a duty to MVI, its subsidiaries and related companies to exercise reasonable care, skill, and diligence in order to ensure that all of the information obtained and supplied to MVI, in connection with their representation, was true and accurate.

70. Defendants breached their duty of care by making the misrepresentations and omissions described above when, in the exercise of reasonable care, they should have known that these misrepresentations were misleading at the time they were made.

71. As a direct and proximate result of the professional negligence of Defendants, MVI, its subsidiaries and related companies have suffered damages in excess of $200,000,000.00, exclusive of interest, attorneys' fees, and costs.

WHEREFORE, Cuthill demands judgment against Defendants awarding compensatory damages for all harm suffered as a result of their professional negligence; awarding prejudgment interest at the maximum rate allowed by law; awarding court costs; and awarding any other relief this Court deems appropriate.

## COUNT V
## NEGLIGENT SUPERVISION

72. Cuthill incorporates paragraphs 1 through 50 of the Complaint as if fully set forth herein.

73.  This Count is a cause of action against Moore & Co. for the negligent supervision of Hutto.

74. Moore & Co. owed MVI, its subsidiaries and related companies a duty to use reasonable care in supervising the conduct and activity of Hutto in connection with their representation of MVI, its subsidiaries and related companies.

75.  Moore & Co. breached its duty of reasonable care by failing to supervise Hutto to ensure that their conduct and activities were not fraudulent or deceptive and that all of their work product and representations on behalf of MVI were true and accurate.

76.  As a direct and proximate result of this breach, MVI has suffered damages in excess of $200,000,000.00 exclusive of interest, attorneys' fees and costs.

WHEREFORE, Cuthill demands judgment against Moore & Co: (1) awarding compensatory damages for all harm suffered as a result of its negligent supervision of MVI; (2) awarding prejudgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

/s/ Elizabeth A. Green
Elizbeth A. Green
Florida Bar. No. 0600547
Jennifer S. Eden
Florida Bar No. 0867594
Jimmy D. Parrish
Florida Bar No. 526401
Latham, Shuker, Eden & Beaudine, LLP
390 North Orange Avenue, Suite 600
Orlando, Florida 32801
Telephone: (407) 481-5800
Facsimile:  (407) 481-5801
Attorneys for Debtor/Plaintiff